UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 23-cr-203 (DLF) |
| v. : | |
| : | |
| SCOTT RAY CHRISTENSEN and : | |
| HOLLY DIONNE CHRISTENSEN, : | |
| : | |
| Defendants. : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Defendants Scott Christensen and Holly Christensen to 45 days of incarceration, 60 hours of community service, and $500 in restitution.

I.  **Introduction**

The Christensens participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the Government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the Government has sought restitution based on a case-by-case evaluation.

1

The Christensens each pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). The Government's recommendation is supported by: (1) the extended period of time the Christensens were inside the Capitol – Scott Christensen for 49 minutes, and Holly Christensen for 39 minutes; (2) their entry into the Senate office hallway on the fourth floor; (3) the fact that they remained inside the building despite the fact that Holly Christensen herself was hit by pepper spray, a clear sign that their presence was not authorized; (4) the fact that Scott Christensen's prior knowledge of the Capitol building as an intern would have made obvious to him how unique and dangerous the situation at the Capitol was that day; and (5) their lack of remorse for their conduct on January 6.

The Court must also consider that the Christensens' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of the Christensens' crime support a sentence of 45 days of incarceration.

**II.     Factual and Procedural Background**

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the Government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 38 (Scott Christensen Statement of Offense) ¶¶ 1-7 and ECF 40 (Holly Christensen Statement of Offense) ¶¶ 1-7.

*The Christensens' Role in the January 6, 2021, Attack on the Capitol*

Scott Christensen and Holly Christensen are a married couple from Puyallup, Washington. They traveled from Washington State to Washington, D.C. on January 4, 2021. On January 6, 2021, they attended the "Stop the Steal" rally at the Washington Monument. From the rally, the

Christensens marched to the Capitol down Pennsylvania Avenue. They each told the FBI that as they reached Capitol grounds, they saw smoke from the police deploying pepper spray into the crowd. They approached the east side of the Capitol building and ascended the steps up to the East Rotunda Door, congregating with a large group of rioters on the stairs and landing.

Rioters who were already inside the building breached the East Rotunda Door by opening it from the inside at approximately 2:38 p.m. The Christensens entered the Capitol building through the East Rotunda Door five minutes later, at approximately 2:43 p.m., as depicted in Image 1 and Image 2. As they entered, there were alarms going off inside the building.



*Image 1: Open-source video depicting Holly Christensen (yellow) entering the Capitol building through the East Rotunda Door.*

3



*Image 2: Screenshot of CCTV footage depicting Holly Christensen (yellow) and Scott Christensen (green) seconds after they entered the Capitol building through the East Rotunda Door.*

Once the Christensens were inside the Capitol building, they walked into the Rotunda, where they took photos and video on their cellphones. They were inside the Rotunda for approximately four minutes. They then decided to look for a bathroom. Scott Christensen told the FBI that because he had given tours of the Capitol as a Congressional intern, he knew that there were offices and bathrooms on the fourth floor, so the Christensens took the elevator there at approximately 2:52 p.m.

While in the bathroom, Holly Christensen cleaned pepper spray from her face, which she had been exposed to either immediately outside of the building before she entered, or upon entry. Upon exiting the bathroom, the Christensens walked down the hall of the fourth floor, away from the elevator they had used, as depicted in Image 3.



*Image 3: Holly Christensen (yellow) and Scott Christensen (green) walking down the hall of the fourth floor of the Capitol.*

They then returned to the elevator and took it back to the second floor, and re-entered the Rotunda at approximately 3:00 p.m. By 3:07 p.m., the crowd of rioters had grown significantly in the Rotunda, and the Christensens were separated from each other. Holly Christensen had gathered with other rioters around Simone Gold, another rioter who was speaking in the Rotunda over a megaphone. At the same time, Scott Christensen's backpack came open and its contents began to spill, so he bent over to collect them.

At approximately 3:09 p.m., the police inside the Rotunda, who had formed a line, began to corral and push the rioters out of the Rotunda and toward the East Rotunda Door. Holly Christensen, however, remained in the Rotunda, because as the police were pushing the rioters, she became, by her description in a post-arrest interview, "extremely panicked," so she sat down on one of the benches. After a few minutes, an officer escorted her out of the Capitol building via the Memorial Door at the direction of a police officer at approximately 3:22 p.m. Scott Christensen

5

was among the rioters who was pushed out of the Rotunda. He exited the Capitol building via the East Rotunda Door at approximately 3:32 p.m.

The Christensens reunited outside of the building by contacting each other via the walkie-talkies they brought with them. They remained on Capitol grounds until at least 5:04 p.m., when they were captured on the west front of the Capitol in the background of a news broadcast, as depicted in Image 4.



*Image 4: Holly Christensen (yellow) and Scott Christensen (green) on the west front of the Capitol at 5:04 p.m.*

*Post-Arrest Interview: Scott Christensen*

On July 19, 2023, Scott Christensen agreed to be interviewed by the FBI with his attorney. He repeatedly described the scene outside of the Capitol building as "chaos." He said that he and his wife climbed the stairs on the east side of the Capitol building, and that when the doors to the building opened, "There was no going back. We were in the middle of it." Once inside, he said

that there was a police presence, that "everybody was chill" and "there was nothing that felt out of place."

He expressed regret for having been at the Capitol and stated, "That's the day that was the day that was the worst day of our life."

*Post-Arrest Interview: Holly Christensen*

On August 10, 2023, Holly Christensen agreed to be interviewed by the FBI with her attorney. She stated that she did not make a conscious decision to go up the stairs on the east front of the Capitol, and that she did not go up the stairs with the intent of entering the building. She maintained throughout the interview that she was pushed into the building, and that no police officer ever explicitly told her that she was not allowed into the building or that she had to leave the building.

She described a confrontation with an officer inside the Rotunda. She stated that while the police were pushing the rioters out of the Rotunda, an officer pushed her repeatedly in the back, and she got emotional as a result. A second officer told her to sit on the benches to catch her breath, at which point a third officer yelled at her and told her to move. The second officer then escorted her out of the building.

Once outside the building, it took about 20 minutes before she was able to communicate on the walkie-talkie and find her husband. She described the situation as "quite frightening" and that she kept hearing "explosion-like" sounds.

She stated that she was horrified about how the media portrayed what had happened at the Capitol, and that she and her husband decided they needed to protect themselves and "lay low."

*The Charges and Plea Agreement*

On November 28, 2022, the United States charged Scott Christensen and Holly Christensen by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On December 7, 2022, law enforcement officers arrested the Christensens in Washington State. On June 15, 2023, the United States charged the Christensens by a 4-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On September 25, 2023, pursuant to a plea agreement, the Christensens each pleaded guilty to Count 4 of the Information, charging them with a violation of 40 U.S.C. § 5104(e)(2)(G).

### III.  Statutory Penalties

The Christensens now face a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, each defendant faces up to six months of imprisonment and a fine of up to $5,000. Each defendant must also pay restitution of $500 under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days of incarceration, 60 hours of community service, and $500 in restitution.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

8

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the Christensens' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like the Christensens, the absence of violent or destructive acts is not a mitigating factor. Had the Christensens engaged in such conduct, they would have faced additional criminal charges.

There are several aggravating factors in this case. The first is the extended period of time the Christensens were inside the Capitol – Scott Christensen for 49 minutes, and Holly Christensen for 39 minutes – and that they remained on Capitol grounds for at least an hour and a half after exiting the building. This shows the Christensens' persistence in prioritizing their own desires and agenda over that of law enforcement. The longer that rioters were in the building, the more difficult it was for the police to secure the building and allow for Congress to return to its work.

Secondly, the Christensens' entry into the Senate office hallway on the fourth floor, demonstrates the Christensens' persistent brazenness on January 6. They continued to approach the Capitol despite hearing repeated explosions and seeing smoke from pepper spray. They entered the building as part of a mob while alarms were going off. Then they went to the fourth floor, an area that Scott Christensen knew for certain was a private work area, to use the bathroom. Highly mobile rioters like the Christensens made it harder for police to control and ultimately contain the mass of people who broke into the building. So, while nonviolent, their actions were still harmful to police officers and added to the chaos that delayed the Electoral College certification vote for several hours.

Thirdly, the Christensens remained inside the building despite the fact that Holly Christensen herself was hit by pepper spray, a clear sign that their presence was not authorized.

Fourthly, the fact that Scott Christensens' prior knowledge of the Capitol building as a Congressional intern would have made obvious to him how unique and dangerous the situation at the Capitol was that day, and that they did not have permission to enter or remain in the building.

Finally, neither Scott Christensen nor Holly Christensen has expressed remorse for their conduct. Although Scott Christensen called January 6 the worst day of his life, his regret surrounding the day is clearly about the consequences to him and his wife, not to the country. Holly Christensen has expressed no remorse whatsoever.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 45 days of incarceration in this matter.

### B. History and Characteristics of Scott Christensen and Holly Christensen

Neither Scott Christensen nor Holly Christensen has a criminal history. They both pleaded guilty quickly after the Government filed an information in District Court. They have complied with the terms of their supervision during the pendency of this case. Their PSRs reflect a stable family and work environment.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack

10

on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.") (statement of Judge Walton). This was not a protest. *See United States v.*

11

*Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to the Christensens also weighs heavily in favor of a term of incarceration.

Although the Christensens accepted responsibility by pleading guilty early in the process, neither has taken any steps to denounce their actions on January 6, 2021. While Scott Christensen told the FBI that January 6 was one of the worst days of his life and that he regretted his participation in it, that sentiment speaks to the effect on his life, suggesting it comes from a place of self-preservation. The comment does not convey genuine remorse for his part in the effect that the riot had on our nation as a whole and on the police officers present at the time.

Holly Christensen, despite having pleaded guilty, remains defiant, claiming that she was allowed to be inside the building because no police officer specifically approached her to tell her that she was not permitted inside or that she had to leave. She is indignant about how January 6 was portrayed in the press and maintains that the only violence she saw that day was perpetuated by the police.

As a result, the Court should view any remorse that either defendant expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized

that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms. The Court must sentence the Christensens in a manner sufficient to deter them specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the Government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence the Christensens based on their own conduct and relevant characteristics, but should give substantial weight to the context of the unlawful conduct: their participation in the January 6 riot.

The Christensens have each pleaded guilty to Parading, Demonstrating, or Picketing in Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, and pleaded guilty to § 5104 offenses, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, or as in this case, the upper floor of the Capitol, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. John Hubert Getsinger,* 21-CR-00607 (EGS), and *United States v. Stacie Ann Hargis-Getsinger,* 21-CR-00670 (EGS), the defendants, a married couple, pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). The defendants entered the Capitol through the Rotunda doors and stayed for 39 minutes. While inside, they entered Minority Leader McCarthy's office and smoked marijuana on the Capitol grounds. Post-siege, both defendants boasted about their involvement in the January 6 siege on social media, notably failing to express remorse for their actions at the Capitol. Judge Sullivan sentenced the defendants to 60 days' incarceration, 36 months' probation,[3] 100 hours of community service, and $500 dollars in restitution.

---

[3] The court imposed this split sentence before the decision in *United States v. Little*, 78 F.4th 453, 454 (D.C. Cir. 2023) (holding that a defendant convicted of a single petty offense may not be sentenced both to imprisonment and to probation for that offense). A combination of incarceration

In *United States v. Matthew Webler*, 21-cr-741 (DLF), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Webler, who had an extensive criminal history, entered the Capitol through a broken window, traveling past unmistakable signs of violence including broken glass and damaged property, and he cheered and celebrated during the breach. His statements on Facebook and to law enforcement after January 6 revealed a lack of remorse. This Court sentenced the defendant to 45 days of incarceration and $500 in restitution.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pleaded guilty to 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building). They penetrated the Capitol building all the way to the Speaker's Conference Room. Chief Judge Boasberg sentenced the defendants each to 45 days of incarceration and $500 in restitution.

In *United States v. Andrew Ericson,* 21-cr-506 (TNM) the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). The defendant went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. He also took a beer from a mini-fridge. Judge McFadden imposed a sentence of 20 days' imprisonment, 24 months' probation, and $500 in restitution. Judge McFadden discussed the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering

---

and probation is no longer permissible. When comparing sentences, this Court should consider that the judges who imposed split sentences imposed reduced incarceration components in recognition that they also were imposing significant terms of probation. Comparing only the incarceration components to this case underestimates the penalty imposed in prior cases.

15

offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). After entering the Capitol through the Senate Wing Door, Mazzocco went inside the Spouse's Lounge of the Capitol. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing. Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Mazzocco also took smirking photographs of himself during the riot. *Id.* at 2-3, 7-8, 12-13. Judge Chutkan sentenced him to 45 days of incarceration, 60 hours of community service, and $500 in restitution.

In *United States v. Marilyn Fassell*, 21-CR-00692 (CKK), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). The defendant entered many restricted areas in the Capitol, including Speaker Pelosi's office and Senator Merkley's office, staying inside for 40 minutes and smoking a cigarette inside the building. The defendant showed no remorse for her actions and even spoke to the media about her experience in the Capitol after her initial arrest. Judge Kollar-Kottelly sentenced the defendant to 30 days' incarceration and 36 months' probation, and $500 in restitution.

The Government acknowledges that Felipe Marquez, who entered Senator Merkley's office, received a sentence of three months' home detention; the Government recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no

criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB).

These cases are guideposts, but the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

17

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the Christensens must each pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[5] ECF 37 (Scott Christensen Plea Agreement) at ¶ XI, ECF 39 (Holly Christensen Plea Agreement) at ¶ XI. As each plea agreement reflects, the riot at the United States Capitol caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* The Christensens' restitution payments must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* ECF 44 (Scott Christensen PSR) ¶ 103, ECF 43 (Holly Christensen PSR) ¶ 93.

---

[5] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the Government recommends that this Court sentence each Defendant to 45 days of incarceration, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on the Christensens' liberty as a consequence of their behavior and lack of remorse.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
NY Bar No. 5226121
601 D Street, NW
Washington, DC 20530
(202) 803-1612
carolina.nevin@usdoj.gov